**In the Matter of the Application for the DISCIPLINE OF John R. KOTTS, an Attorney at Law of the State of Minnesota.**

**No. C3–82–465.**

Supreme Court of Minnesota.

March 15, 1985.

Michael J. Hoover, Director of Lawyers Prof. Responsibility Bd., William J. Wernz, Asst. Director of Lawyers Prof. Responsibility Bd., St. Paul, for appellant.

William P. Luther, Minneapolis, for respondent.

## PER CURIAM.

John R. Kotts practiced law in Minnesota until the fall of 1981. Although his practice was general in nature, Kotts devoted much of his time to bankruptcy work. On October 20, 1981, while on business in California, Kotts claims to have suffered an angina attack. The record shows that Kotts was treated briefly, but there is no indication that he was unable to return to his practice in Minnesota. Nonetheless, Kotts did not return even though he was the sole shareholder of a professional corporation, J.R. Kotts, Lawyers, P.A.,[1] and had been retained to represent a number of clients.

On October 20, 1981, Kotts' secretary called attorney Michael McNamara, Kotts' only remaining associate in Minnesota, to inform him that Kotts would not be able to return to Minnesota because of health problems. McNamara, who was a first year attorney, tried several times to telephone Kotts, but was unable to reach him and they never spoke again. Dempsey Mork, a business associate of Kotts, called McNamara twice and asked McNamara to take over Kotts' files, but McNamara refused, in part, because he had received two NSF salary checks from Kotts' firm. Mork then contacted attorney Paul Scheerer of the Dorsey & Whitney firm to see if he would represent some of Kotts' clients. Scheerer, however, was unable to do so. Mork also called Bankruptcy Judge Owens and the U.S. Trustee's Office to inform them of Kotts' problems.

Kotts testified that he sent a letter on November 19, 1981 to those clients whose names and addresses he could remember or find. This letter notified the clients that Kotts had had health problems and that he could no longer serve as their attorney. The letter also informed them that a "final statement of [their] accounts including any trust funds" would be prepared. Some clients did not receive this letter. Kotts performed no further work for any of his clients after October 20, 1981 and he was unable to secure other representation for them.

In response to phone calls from Kotts' clients, the U.S. Trustee's Office instituted proceedings pursuant to 11 U.S.C. § 329 to examine the reasonableness of the fees Kotts received from his bankruptcy clients. In three separate proceedings, Bankruptcy Judges McNulty, Owens, and Connelly found that the post-petition legal services provided by Kotts to 10 different clients were valueless. Each judge entered judgments against Kotts in favor of his former clients. On appeal to federal district court, Judge Harry H. MacLaughlin affirmed the orders of Judges Owens and Connelly with respect to the post-petition fees. Judge McNulty's order was never appealed. On October 23, 1984, the Eighth Circuit Court of Appeals affirmed Judge McLaughlin's decision.

In November 1981, the Lawyers Professional Responsibility Board began an investigation into Kotts' conduct. This investigation culminated in the filing of a petition for disciplinary action on April 8, 1982. Among the allegations in that petition are claims that Kotts abandoned his clients without taking reasonable steps to protect their interests and that he failed to return unearned fees or provide accountings to them. On the basis of the evidence presented at a December 6, 1983 hearing, Referee Saetre found eight separate disciplinary violations and he recommended that Kotts be indefinitely suspended.

1. The firm had previously done business under the names, Liberty Lawyers, P.A. and Kotts, Tuohy & Tigue, P.A. Although Kotts employed a number of attorneys, none ever became a partner or a shareholder in the firm.

On February 9, 1984, the Director filed a supplemental petition for disciplinary action against Kotts. In this petition, the Director alleges that Kotts fraudulently misappropriated funds that were to be held in escrow pending the outcome of litigation between the Minnesota Department of Revenue and Kotts' client, Dempsey Mork. After an August 22, 1984 hearing on this matter, Referee Saetre recommended that Kotts be disbarred.

At the time Kotts withdrew representation from his clients, he had already accepted substantial retainers from many of them. At the first hearing before Referee Saetre, Kotts testified that he had received the following sums:

| | | |
|---|---|---|
| 1. | Ryan's Painting and Decorating: | $7,128 |
| 2. | Technistics: | $1,950 |
| 3. | Premiere Plastics: | $2,800 |
| 4. | Bruce Harper: | $5,000 |
| 5. | Leslie & Gail Schaeffer: | $4,000 |
| 6. | Manual Bravo: | $1,800 |
| 7. | North Country Drilling Company: | $4,400 |
| 8. | Babbitt Hardware: | $3,200 |
| 9. | Hayden Marine: | $5,000 |
| 10. | C.D.B. Enterprises: | $2,100 |
| 11. | Suburban Auto: | $1,000 |
| 12. | Westway, Inc.: | $10,000 |
| 13. | Barry Construction Co.: | $15,000 |
| 14. | Dennis Nielsen: | $7,247.35 |

On June 18, 1982, Kotts sent a letter to close out his trust account at the Wayzata National Bank. The account on that day showed a balance of $2,126.26. When asked at the first hearing whose money this was, Kotts testified that he considered it to be his money. When asked on whose behalf it had initially been deposited, Kotts replied: "I thought it was a combination of Nielsen's money and the Park Insulation money." Upon further questioning, Kotts admitted that some of the funds in the trust account were funds he was holding for Park Insulation, a company in which he held a 20% shareholder's interest.

The transcript from the first hearing before Referee Saetre reveals that at least two clients specifically asked Kotts for an accounting of monies they had given him. Hillary Barry sent a letter to Kotts on December 14, 1981. This letter reads in part:

John, now that I am without counsel I must find a new attorney to represent us. I also need any money that I gave you on a retainer that has not been used up. I have never had a billing from you and I don't know how we stand but we must have money coming.

Almost 2 months later, Kotts responded to Barry's request with a letter that accompanied a document permitting Barry to recover $5,000 of the $15,000 he had given Kotts. In this letter of February 8, 1982, Kotts again promised Barry an accounting. Kotts informed Barry that he thought he would be able to provide it within 60 days. Hillary Barry, however, did not receive an accounting until the day of the first hearing before Referee Saetre. That hearing was held on December 6, 1983—almost two years after Barry first requested a final statement of his account.

At the same hearing, Dennis Nielsen testified that his wife had sent a letter to Kotts requesting an accounting. Nielsen also testified that he believed Kotts was holding $2,200 that belonged to either his firm, Building Concepts, or to him personally. Kotts, however, admitted that he never provided an accounting to Nielsen and that his records on Nielsen's file indicate that he owes Nielsen $1,942.35.

Although Kotts testified that he gave a formal accounting to the Schaeffers, he admits that no formal accounting was ever given to the other clients listed above.[2] Kotts contends that he was unable to obtain most of his financial records until May of 1982. Michael McNamara, Kotts' remaining associate in Minnesota testified, however, that most of the firm's financial records were taken to California by Kotts' secretary, Dawn Braund, prior to October 20, 1981. He also testified that he turned over the remaining records to Kotts' attor-

---

2. Kotts' attorney, however, did produce firm records at the bankruptcy court hearings in an attempt to prove that Kotts had earned the retainers he had been given.

ney in November 1981. Regardless of the difficulty Kotts may have experienced in attempting to obtain his records, by his own admission either he or his attorney had the necessary information to provide accountings in May of 1982.

In his brief to this court, Kotts states that he "has offered to return any unearned fees as shown on his books and records." He also admits that his records indicate that he owes Hayden Marine $694.53 and Premier Plastics $1,568.30. There is no mention in his brief, however, that these sums have ever been returned. Finally, Kotts concedes that the evidence suggests "a belated fee dispute" with his client Nielsen.

Although Kotts maintains he took all reasonable steps to protect his clients, it is clear that he failed to provide accountings to some of his clients and that he did not return some unearned fees. There is no evidence that Kotts was so disabled he could not answer phone calls. Kotts' associates, Dawn Braund and Dempsey Mork, however, told various callers that Kotts had suffered a heart attack, that he was hospitalized, that "tests looked bad," and that doctors would not let Kotts talk with others—none of which was true. Kotts failed to file any notices of withdrawal with the bankruptcy court despite his awareness of that requirement. He also admits that "no one seemed to take care" of his clients. Although Kotts told Dennis Nielsen that he would see Nielsen's bankruptcy case through for $2,500, Nielsen had to pay another attorney for this work and never received a refund from Kotts.

Evidence was also received at the first hearing which indicates that Kotts was either delinquent in paying or did not pay some of the firms' obligations, that he improperly advertised his legal services, and that he improperly used a firm name which included the names of lawyers who were neither partners nor shareholders.

Based on these facts the referee reached the following conclusions of law:

I. Respondent's conversion of client funds violated DR 9–102(B)(3) and (4), Minnesota Code of Professional Responsibility (MCPR).

II. Respondent's failure to account for client property violated DR 9–102(B)(3), MCPR.

III. Respondent's failure to maintain books and records sufficient to demonstrate compliance with DR 9–102 violated DR 9–103(A)(1)), MCPR.

IV. Respondent's commingling personal and client funds in his client trust account violated DR 9–102(A), MCPR.

V. Respondent's complete abandonment of his clients violated DR 6–101(A)(3) and DR 7–101(A)(1), (2) and (3), MCPR.

VI. Respondent's failure to repay his clients pursuant to bankruptcy court orders violates DR 1–102(A)(4) and DR 7–106(A), MCPR.

VII. Respondent's failure to pay Apollo Movers until July, 1983, violated Opinion 7 of the Lawyers Professional Responsibility Board and DR 1–102(A)(5) and (6), MCPR.[3]

VIII. Respondent's placement of Director's Exhibit 6 in the Minneapolis paper violated DR 2–101(A), MCPR.

Based on these conclusions, the referee recommended that Kotts:

be suspended indefinitely from the practice of law and that reinstatement not be considered until such time as he files written documentation of settlement with his former clients as set forth in the foregoing Findings; that reinstatement should further be conditioned upon respondent's resuming residence in the State of Minnesota and [upon his submitting to] a suitable probationary period [to

---

**3.** On January 7, 1983, the Lawyers Professional Responsibility Board repealed Opinion No. 7 which dealt with an attorney's liability for professional indebtedness.

be] monitored by the office of the Lawyers Professional Responsibility Board.

Before we could consider this recommendation, the Director filed a supplemental petition for discipline against Kotts and a second hearing was held. The evidence at this hearing established the following:

In 1978, Kotts was representing his business associate, Dempsey Mork, in a tax dispute with the Minnesota Department of Revenue. In order to secure the release of funds which the Revenue Department had levied against, Kotts on behalf of Mork entered into an agreement with Neil Scott, Special Assistant Attorney General. Kotts and Scott agreed that in exchange for the release of Mork's funds, Mork would post a $5,000 bond in order to secure payment of any judgment that might be entered against him. Scott testified, however, that before they signed a written agreement Kotts informed him that it would be less expensive for Mork to place $5,000 in escrow than it would be for Mork to post bond in that amount. Scott agreed to this arrangement provided that "it was understood the money couldn't be released without the approval of each of the parties."

On December 20, 1978, Kotts met Scott at Scott's office. Kotts brought with him a certificate of deposit, signature cards, and a written agreement that he had drafted. Although the written agreement referred in paragraph 1 to Mork posting a bond to be evidenced by a $5,000 certificate of deposit, Scott was satisfied that it would adequately reflect his understanding with Kotts. Scott testified that Kotts told him both of their signatures would be required to withdraw the money. The written agreement drafted by Kotts provided in paragraph 2:

> That said bond is to secure payment of any judgment entered in the pending litigation adverse to Dempsey Mork, except that the above described certificate of deposit evidencing said bond may not be drawn upon by either party entitled thereto until such time as the Commis-

sioner and Dempsey Mork have exhausted all available appeals from any judgment entered in said litigation or until such time as appeal may not be taken. Although the signature card was titled "John Kotts-Neil Scott," the deposit certificate was titled "John Kotts in trust for Neil Scott."

In early 1979, Kotts served a complaint upon the Revenue Department in connection with Mork's dispute over his alleged tax liabilities. Scott answered this complaint, but Kotts failed to pursue the litigation. Early in 1982, having heard nothing from Kotts after the complaint was served, Scott sent discovery requests to Kotts at the address he had been given. These requests were returned as undeliverable. When he was unable to locate Kotts, Scott contacted the First National Bank to see if the $5,000 escrow amount was on deposit. In speaking with a bank clerk, Scott learned that the money was still there, but that it was being held in a trust account. Concerned that the money might be withdrawn, Scott secured a court order enjoining Kotts from withdrawing it. Scott, however, was unable to serve notice of the court order on Kotts.

On June 22, 1982, Kotts withdrew the $5,000 and the accrued interest ($1,095) after signing an affidavit stating that he was "authorized to receive the monies deposited" and that he "is the only person lawfully authorized to receive or withdraw the moneys represented by said Savings Certificate."[4] Kotts did not notify Scott of this withdrawal even though the litigation between Mork and the Department of Revenue had not been resolved.

Kotts' defense that he was, in fact, the only person authorized to withdraw these funds because the deposit was titled "John Kotts in trust for Neil Scott" is disingenuous at best. Kotts drafted the agreement that he and Scott had signed and paragraph 2 of that agreement clearly provided that no one was entitled to withdraw the

---

4. First National Bank admits its negligence in releasing these funds despite the court order prohibiting their release to Kotts without Scott's consent.

funds until the litigation between Mork and the Revenue Department was concluded.

In late 1983, Scott learned that Kotts had withdrawn the money. After calling Dempsey Mork's California phone number, Scott asked for John Kotts. When Kotts answered, Scott asked him "how he had the nerve to take the money out of the escrow account." Kotts replied that he had taken the money out and turned it over to Mork's new attorney because he was no longer practicing law in Minnesota. Kotts, however, never notified Scott that he was withdrawing as Mork's attorney.

Scott testified that a few days later he was contacted by an attorney named Allen Shepard, who stated that he represented Mr. Kotts. Scott also testified that after informing Shepard of the situation, Shepard told him that: "Mr. Kotts would have to pay the money from his own sources and asked if we could, would consider some kind of reduction because Mr. Kotts was not in a position to raise $5,000." Scott told Shepard that it would take at least $5,000 to "resolve the litigation; otherwise we wanted the full amount placed back in the escrow pending an outcome of the court determination of liability." In January 1984, Scott and Mork executed a "closing agreement" whereby the litigation was resolved. Pursuant to this agreement, the department received a $5,000 check in a letter from Shepard in which Shepard states that he was enclosing the money that "I have been holding in this matter."

The check issued to Kotts by the First National Bank on June 22, 1982, when the funds from the escrow account were withdrawn, was later endorsed by Kotts: "John R. Kotts—for deposit only." Kotts neither appeared at the second hearing before Referee Saetre nor has he offered any evidence to identify the account into which this check was deposited. It seems reasonable, however, to conclude that it was deposited in Kotts' account.

The referee found this conduct to violate DR 1–102(A)(4), (5) and (6), DR 7–102(A)(5), and DR 9–102(A). He now recommends that Kotts be disbarred. Since Kotts or-

dered transcripts of both hearings before the referee, the referee's findings of fact and conclusions of law are not conclusive. *See* RLPR 14(d).

■ This court has indicated that it will give due weight to a referee's factual determinations. *See In re Austin,* 333 N.W.2d 633, 635 (Minn.1983). In this case, however, we are concerned by the emphasis the referee placed on the bankruptcy court orders directing Kotts to return certain retainer fees as unearned. Kotts admits these judgments against him are final. He further concedes that not paying them would violate the disciplinary rules. Nevertheless, he argues that the extensive records he produced to show the time expended on these accounts preclude a determination for disciplinary purposes that he was not justified in believing he had earned these fees. Kotts also contends that use of the bankruptcy court orders in these proceedings would violate his procedural due process rights. Although we do not reach this contention, we note that the standard of proof in the bankruptcy proceedings was a fair preponderance of the evidence, while the Director in these disciplinary proceedings must prove the allegations by clear and convincing evidence.

The referee in his memorandum after the first hearing states that "[t]he numerous bankruptcy defaults as evidenced by the orders of [the three bankruptcy judges and the federal district court] are ample evidence of Kotts' indifference" to the plight of his clients. The referee in so concluding appears to have overstated the bankruptcy court orders' value as evidence in these disciplinary proceedings in light of the testimony concerning the work performed for these clients and in light of the time records Kotts produced to show his justification for retaining those fees. To the extent that the referee's initial order is based on such a conclusion, we will not give his findings the usual deference and weight.

■ The hearing on the Director's supplemental petition for disciplinary action

against Kotts, however, shows that Kotts clearly and deliberately violated the terms of an escrow agreement under which he assumed certain obligations to counsel for the State of Minnesota. His violation of this agreement is egregious and indefensible.

We now are faced with deciding what weight to give to the referee's recommendation for disbarment considering it was based on his prior conclusion that Kotts had wholly abandoned his clients. Since we have determined that this conclusion is not justified on the record before us, we must consider whether Kotts' violation of the escrow agreement, together with the other incidents of misconduct, present grounds for disbarment. We are satisfied that the record, even without the bankruptcy court orders, might sustain an order for disbarment. However, since the Director must prove all allegations by clear and convincing evidence, and since some of the allegations are legitimately disputed, we adopt a sanction less severe than immediate disbarment.

We order John R. Kotts immediately suspended from the practice of law. The following conditions shall apply to his status as a lawyer licensed to practice in Minnesota:

1. He may not apply for removal of the order of suspension prior to July 1, 1988.

2. An application for reinstatement will not be considered unless accompanied by the following:

   a. Proof that Kotts has provided written accountings to all of his former clients who have not as yet received an accounting from him.

   b. Satisfactory evidence to establish that all judgments against John R. Kotts have been paid.

   c. Proof that Kotts has received a passing grade on the Multistate Ethics exam after the filing of this order.

   d. An affidavit of John R. Kotts that he has not engaged in the practice of law anywhere during the term of his suspension.

   e. Kotts' written consent to a supervised two-year probationary period of practice.

3. In the event an application for reinstatement accompanied by the documents specified in paragraph 2 is not received and filed in the office of the Clerk of Appellate Courts on or before July 1, 1990, an order of disbarment shall be entered ex parte and without further proceedings or notice to John R. Kotts.

Order of Suspension entered.

SCOTT, J., took no part in the consideration or decision of this case.

SIMONETT, Justice (concurring specially).

While I join in the court's opinion, I wish to comment further on the finding of improper advertising of legal services. Respondent's newspaper advertisement reads in part:

**SURVIVE**

**DIVORCE**

FINANCIALLY

**RECEIVE**

$600/Mo. Financial support
if you're raising two children,
$500 if you're supporting one.

**RECEIVE**

Financial support that is not
dependent on your spouse.

**RECEIVE**

½ hour free consultation * * *

Mr. Kotts sees nothing wrong with this. He says his advertisement states a fact, namely, that women with children are eligible to receive financial assistance from government agencies; and, further, he says that the advertisement makes no guarantees and does not identify him as the source of the financial support.

The referee found this advertising to violate DR 2-101(A), Minnesota Code of Professional Responsibility. What troubles me is not so much the violation, which is clear enough, as Mr. Kotts' apparent belief

that his advertisement is not only accurate but professionally appropriate.

So long as lawyer advertising is not false, fraudulent, misleading or deceiving, it passes constitutional muster and the disciplinary code, but one hopes for more. One would hope that Mr. Kotts, even if he had said in his ad what he says he wanted to say (which would have been perfectly appropriate), would have done so without reverting to hucksterism. Simply because free speech allows us to make fools of ourselves is no reason we should avail ourselves of the opportunity. For then, sadly, it is the whole profession that suffers.

AMDAHL, Chief Justice (concurring specially).

I join in the opinion of the court and also in the special concurrence of Justice Simonett.

PETERSON, Justice (concurring specially).

I join in the court's opinion and also in the added words of Justice Simonett.

COYNE, Justice (concurring specially).

I join in the opinion of the court and also in the special concurrence of Justice Simonett.